UNITED STATES BANKRUPTCY COURT
FOR THE
WESTERN DISTRICT OF KENTUCKY

In re: THIRTEENTH FLOOR ENTERTAINMENT
CENTER, LLC

    Debtor                                        CASE NO. 04-36349
                                                            CHAPTER 7

GORDON A. ROWE, JR., CHAPTER 7 TRUSTEE OF THE ESTATE OF THE ABOVE-NAMED DEBTOR, THIRTEENTH FLOOR ENTERTAINMENT CENTER, LLC[1]

    Plaintiff

vs.

LOUISVILLE GALLERIA, LLC

    Defendant                                  Adv. Proc. No. 09-3043

**MEMORANDUM-OPINION**

THIS ADVERSARY PROCEEDING is before the Court after the conclusion of a trial on the merits of Plaintiff's complaint against Defendant for breach of contract and Defendant's counter-claim against Plaintiff for breach of contract.[2] As more fully discussed below, the Court finds in

---

[1] By virtue of Federal Rule of Bankruptcy Procedure 7017, the Chapter 7 Trustee is the real party plaintiff in interest.

[2] This complaint was originally filed by the Debtor against Defendant in the Jefferson County, Kentucky, Circuit Court. The suit was removed to this Court under 28 U.S.C. § 1452(a), which permits either party to remove an action from state court to federal court upon the filing of a bankruptcy case by one of the parties. *See also* Fed. R. Bankr. Proc. 9027(a).

1

favor of Defendant. By virtue of 28 U.S.C. § 157(b), this is a core proceeding.[3] The following constitutes the Court's Findings of Fact and Conclusions of Law pursuant to Federal Rule of Bankruptcy Procedure 7052.

## FINDINGS OF FACT

This Adversary Proceeding presents a textbook example of how failure to observe contract formalities can render a business relationship extremely complicated, and ultimately unsatisfactory to one or both parties. Here, as further discussed below, Plaintiff could have avoided a great deal of trouble and expense if it had followed the formal notification provisions of its contract with Defendant to seek clarification and confirmation of its understanding of the parties' obligations under their contract. On at least three occasions–immediately after execution of the contract, upon Defendant's delivery of leased space to Plaintiff, and following Defendant's decision to change the cooling system for the leased space–Plaintiff could have, and should have, sent formal notice to Defendant either asserting a breach of the contract or seeking written clarification and/or modification of Plaintiff's contract obligations from that point forward. Plaintiff failed to do so, and, therefore, can only blame itself for the messy ending to its business relationship with Defendant.

Defendant operates a multi-use real estate development in downtown Louisville known as Fourth Street Live. Fourth Street Live consists of several buildings, including the historic Kaufman-Strauss Building.

Sometime in 2002, Plaintiff entered into discussions with Defendant to lease space at Fourth Street Live to open a fitness center, which ultimately resulted in Plaintiff and Defendant entering into the Shopping Center Lease dated November 24, 2003, that is the subject of this Adversary

---

[3]Defendant's counterclaim against Plaintiff is clearly a core proceeding under 28 U.S.C. § 157(b)(2)(B). Plaintiff's claim against Defendant would not at first blush appear to be a core matter. At the September 17, 2009 pre-trial conference in this Adversary Proceed, however, Plaintiff expressed its willingness to have this Court hear this Adversary Proceeding and enter a final order, which naturally would be subject to the parties' right to appeal. Accordingly, with the parties' acquiescence, the Court believes it should treat this entire matter as a core proceeding and make findings of fact and conclusions of law under 28 U.S.C. § 157(c)(2). If, however, the United States District Court for the Western District of Kentucky reviews this matter and concludes that it is not a core proceeding, this Court requests that the District Court treat the findings of fact and conclusions of law herein as proposed findings of fact and conclusions of law under 28 U.S.C. § 157(c)(1) for a *de novo* review.

Proceeding (the "Lease").  During those discussions, Plaintiff's principals[4] visited the potential premises several times.  Although the parties began discussing space on the third floor of the Kaufmann-Strauss Building, Plaintiff ultimately preferred similar space on the second floor, and at some point in the negotiation process, the parties shifted discussions to the second floor.

Negotiations were extensive, taking roughly a year to complete.  The parties were represented by capable counsel.  Defendant was represented by in-house counsel, Mr. Robert Fowler ("Mr. Fowler").  Plaintiff was represented by Mr. Daniel Walter ("Mr. Walter"), an experienced real estate attorney with the Louisville, Kentucky law firm, Ackerson & Yann.  The parties exchanged at least five formal drafts of the Lease, and there were 412 changes made and accepted between the first draft and the final, executed Lease.  Plaintiff did not have an architect or engineer review any draft of the Lease.

Plaintiff apparently signed the Lease on November 19, 2003, despite sending an email on November 14, 2003, to Defendant's principle representative, Mr. Blake Cordish ("Mr. Cordish"), stating that Plaintiff had signed the Lease that day.  In any event, Mr. Cordish signed the Lease on behalf of Defendant on November 24, 2003, in Baltimore, Maryland in the presence of Mr. Fowler.

Around the time that it entered into the Lease,[5] Plaintiff hired Mr. Donald DeMars ("Mr. DeMars"), a California-based interior designer specializing in fitness centers, to design the fitness center.  Mr. DeMars, however, never visited the premises.  Instead, Plaintiff hired Mr. Vadim Kaplan ("Mr. Kaplan"), a Louisville architect, to provide Mr. DeMars with needed information and to prepare detailed construction plans and drawings for the premises.  Plaintiff, however, did not hire

---

[4]Plaintiff is a limited liability company, now in bankruptcy, which had been newly formed to operate a health and fitness club at Fourth Street Live. At the time of the events in questions here, Plaintiff's members were Mr. Jack Howell ("Mr. Howell"), who owned 90% of the membership interests, and Mr. James Schwab ("Mr. Schwab"), who owned 10% of the membership interests. Messrs. Howell and Schwab, along with other business partners, owned several related fitness centers, none of which were located in a downtown setting.  Mr. Schwab entered the fitness center business in 1996.  Mr. Howell entered the fitness center business in 2000.

[5]It is not clear exactly when Plaintiff formally hired Mr. DeMars, although by mid-November 2003, Mr. DeMars was at least communicating with Plaintiff about the design of the facility.

Mr. Kaplan until February 11, 2004. This prevented Plaintiff and Mr. DeMars from fully understanding all of the construction and design issues until after Mr. Kaplan had visited and analyzed the site, which certainly did not occur until after February 11, 2004.[6]

The Lease contains exhibits that are expressly made a part of the Lease by its terms. Exhibit A identifies the leased premises (the "Premises"). The Lease also describes the approximate square footage and location of the Premises and refers to a "site plan attached as Exhibit A" to show the relative location of the Premises.

Notwithstanding the fact that the Lease expressly incorporates the exhibits as part of the Lease, Plaintiff apparently signed the Lease with no exhibits attached. Rather, the exhibits were attached to the Lease by Defendant when it executed the Lease several days later.

Plaintiff, however, must have known what each exhibit would contain when it signed the Lease. All exhibits other than Exhibit A had been attached to the various drafts of the Lease exchanged between the parties. Exhibit A was not attached to these drafts because it was not yet finalized when the drafts were being exchanged.[7]

There is, however, no question that Plaintiff and Defendant each understood what premises were being leased and what Exhibit A would depict in general. Section 201(a) of the Lease describes the space as "approximately" 20,970 square feet of "gross leasable area on the second level of the Shopping Center known as Fourth Street Live . . . ." Section 201(a) of the Lease also contemplates that the exact size of the Premises could be changed by the landlord as long as the "general appearance" and "relative location" of the Premises did not change and the amount of floor space of the Premises did not vary by more than 3% from the 20,970 square feet contemplated.

The parties agree that the space depicted in the Exhibit A ultimately attached to the Lease is indeed the space contemplated as being leased by Plaintiff, at least with respect to "relative location." Plaintiff only takes issue with the addition of a service corridor in the final drawing of the Premises attached as Exhibit A, which Plaintiff claims was unexpected, and which reduced the space

---

[6]Plaintiff attempts to shift blame to Defendant for failing to give Plaintiff accurate drawings of the premises prior to that time, but Defendant had no obligation under the Lease to provide Plaintiff with any drawings of the premises.

[7]Mr. Fowler testified that he does not typically attach premises exhibits to drafts of leases entered into by his employer until late in the negotiation process.

usable by Plaintiff by some undetermined amount and reduced the amount of natural light into the Premises.

The Court is skeptical of Plaintiff's claim that it was surprised by the inclusion of the service corridor in Exhibit A. In a November 3, 2003 email sent by the Fourth Street Live leasing agent, Kevin Mayhugh ("Mr. Mayhugh") to Mr. Cordish, Mr. Mayhugh informs Mr. Cordish that Plaintiff wants the service corridor placed in a manner to minimize its impact on the Premises. This shows that Plaintiff was aware of the potential inclusion of the service corridor well before signing the Lease. On November 5, 2003, Defendant's architect sent Mr. Howell an autoCAD file that shows the placement of the service corridor in the Premises. Mr. Howell testified that he did not look at the file but forwarded it to Mr. Mayhugh. It seems somewhat unbelievable that Mr. Mayhugh, who was at that moment discussing the service corridor placement with Plaintiff, would not have opened the file and informed Mr. Howell of Defendant's layout of the service corridor in the Premises. On December 9, 2003, Plaintiff's attorney, Mr. Walter, sent Plaintiff the fully executed Lease with exhibits attached but made no mention of any problems with Exhibit A. The Court has to believe that Mr. Walter, an experienced real estate attorney who had been intimately involved in the Lease negotiations, would have at least reviewed the exhibits and pointed out to his client anything unexpected.

Furthermore, Section 201(a) of the Lease expressly contemplates variation in the exact size of the Premises, within a limit of 3%, and provides a formal mechanism for re-measurement of the Premises and adjustment of rent. In Section 401 of the Lease, Plaintiff "expressly acknowledges that Landlord makes no representations or warranties regarding the suitability of the Premises for Tenant's business." Section 2705 of the Lease provides a formal mechanism by which the parties must deliver to each other "notices, demands and requests" pertaining to the Lease. Plaintiff never used Section 2705 of the Lease to provide Defendant with formal notice that it believed that the Exhibit A attached to the Lease was incorrect. Plaintiff also never sent Defendant a formal notice or request under Section 2705 of the Lease either requesting a re-measurement of the Premises or notifying Defendant of its belief that the Premises described in Exhibit A was either more than 3% smaller than originally contemplated or substantially altered in "general appearance" or "relative location."

Plaintiff attempts to explain its inaction as taking Mr. Walter's advice to negotiate a solution

rather than litigate. Even if that were true–strangely, Plaintiff did not call Mr. Walter to testify–Plaintiff essentially ratified the attachment of Exhibit A by failing to send Defendant formal notice of its alleged disagreement. Accordingly, for the foregoing reasons, the Court finds that the Exhibit A attached to the Lease by Defendant when it signed the Lease is the proper Exhibit A to the Lease.

Under Section 401 of the Lease, Defendant was to deliver the Premises to Plaintiff "as is," subject only to the substantial completion of certain items of landlord work expressly set forth in Exhibit C to the Lease. Also under Section 401 of the Lease, any elements of Exhibit C that were incomplete upon delivery were to be addressed through a "punchlist" of items to be completed by the parties, and "Tenant's taking possession of the Premises shall be conclusive evidence against Tenant that the Premises were in satisfactory condition when Tenant took possession, subject only to completion of such Punchlist items and latent defects of which Landlord is notified in writing within ninety (90) days."

Defendant delivered the Premises to Plaintiff on January 30, 2004, by providing Plaintiff with a Notice of Possession as required under Section 316 of the Lease. Plaintiff asserts that Defendant failed to provide either chilled water to the Premises or HVAC rooftop units as required under Paragraph 10 of Exhibit C of the Lease prior to sending the Notice of Possession.[8] Plaintiff, however, never sent notice to Defendant under Section 2705 of the Lease disputing the Notice of Possession or otherwise asserting that delivery of the Premises did not occur on January 30, 2004. Plaintiff also never formally contacted Defendant under Section 2705 of the Lease regarding a punchlist of incomplete items of Exhibit C. Moreover, Plaintiff delivered an estoppel certificate to Defendant's lender warranting that Plaintiff had accepted possession of and was occupying the Premises and that Defendant had complied with all its Lease obligations with respect to the construction, fixturing and equipping of the Premises. Plaintiff also acknowledged in a March 3, 2004 email to Defendant that the space was ready for build-out. In any event, based on the credible testimony of Mr. Gary Darnell, Tenant Coordinator for Fourth Street Live, the Court finds that

---

[8]Plaintiff does not dispute that Defendant completed all of the other applicable items of work set forth in Exhibit C.

6

Defendant had supplied chilled water to the Premises as of the date of the Notice of Possession.[9]

The Lease established several performance deadlines for Plaintiff. Section 1401 of the Lease required that, within ninety days of the execution of the Lease, Plaintiff was to deliver for Defendant's approval "four (4) copies of plans and specifications showing in reasonable detail any and all interior and/or exterior alterations or improvements that Tenant proposes to make to the Premises, including interior and exterior signage." Under Section 1401 of the Lease, such plans also had to "be in accordance with all requirements of all applicable governmental authorities and Laws for submissions to obtain a building permit." Plaintiff's plans were due by February 24, 2004, ninety days after November 23, 2004. Although Plaintiff provided tentative "layout" plans to Defendant sometime in early 2004, there is no dispute that these layout plans could not have been used for construction or to obtain a building permit as required by Section 1401 of the Lease.[10]

Plaintiff asserts that it was delayed in completing its plans, and delayed in completing subsequent Lease obligations, by Defendant's decision to switch from a chilled water cooling system to a rooftop HVAC system after delivery of the Notice of Possession. The Court notes, however, that Exhibit C clearly contemplates such course of action. Had Plaintiff wanted to avoid the potential disruption of a change of systems, it could have insisted that Defendant's option to do so be deleted from Exhibit C. In any event, Plaintiff never sent Defendant formal notice expressing its belief that Defendant had breached the Lease by changing systems and delaying Plaintiff's work or even expressing concern with the change and requesting a written extension of deadlines.

Defendant delivered notices of default to Plaintiff regarding the failure to deliver plans on

---

[9]Plaintiff in fact does not dispute that Defendant made chilled water available to the Premises. Rather, Plaintiff asserts that the *air handling units* contemplated by Defendant at that time would not have adequately circulated the air cooled by the chilled water for Plaintiff's purposes. Section 1706 of the Lease, however, governs the provision of air handling units, not Exhibit C. Therefore, Plaintiff should have claimed that Defendant defaulted on its obligations under Section 1706 of the Lease rather than Exhibit C. Regardless, Plaintiff never sent Defendant any formal demand or notice of default under Section 2705 of the Lease with respect to provision of air handling units under Section 1706 of the Lease, but continued to attempt to perform under the Lease. Indeed, as late as August 23, 2004, when Plaintiff sent Defendant a letter detailing its concerns with Defendant's past performance under the Lease, Plaintiff made no mention of any issue with the chilled water or air handling units.

[10]The Court notes, again, that Plaintiff did not even engage its architect, Mr. Kaplan, to prepare the plans until February 11, 2004.

7

March 3, 2004, and April 15, 2004, but chose not to terminate the Lease at that time. Plaintiff eventually completed its plans on June 25, 2004, and delivered those plans to Louisville Galleria on July 8, 2004, more than four months after they were due. Defendant approved the plans on July 13, 2004.

Under Section 402 of the Lease, upon delivery of the Notice of Possession by Defendant, Plaintiff was required to "with due diligence proceed to install such fixtures and equipment and to perform all other work as shall be required pursuant to Tenant's Plans . . . , as approved in writing by Landlord, or otherwise necessary or appropriate in order to prepare the Premises for the opening and continued operation of Tenant's business." Under Sections 201(m) and 307 of the Lease, this work was to be completed during a 180-day "Fixturing Period" that commenced with the Notice of Possession. Because the Notice of Possession was sent on January 30, 2004, the Fixturing Period ended on July 28, 2004—less than three weeks after Plaintiff finally delivered its plans for approval. Plaintiff never completed its work to renovate the premises.

Under Sections 321 and 701 of the Lease, Plaintiff was required to begin paying rent on the "Rent Commencement Date," which was defined as the next calendar day after the last day of the Fixturing Period, or the date on which Plaintiff opened its fitness center for business, whichever came first. Because Plaintiff never opened its fitness center, the Rent Commencement date was July 29, 2004, the day after the Fixturing Period ended. Plaintiff never paid rent.

Under Section 502 of the Lease, Plaintiff was required to open its fitness center for business and operate its business continuously beginning on the Rent Commencement Date. Plaintiff never opened its fitness center for business.

At some point after executing the Lease, Plaintiff realized that the Premises would not be suitable for its intended aerobic exercise area and sought additional space from Defendant. The parties dispute exactly when this occurred, but by mid-December 2003, Plaintiff and Defendant were apparently discussing the leasing by Plaintiff of additional space.[11] Plaintiff ultimately chose to

---

[11]The record is not clear whether these discussions started because Plaintiff wanted additional space for other reasons, such as office space, basketball courts and/or women's only facilities or because, as Plaintiff asserts, Defendant had "taken away" space to install the service corridor. Certainly no writing earlier than March 2004 expresses Plaintiff's position that Defendant took space away from it.

8

lease additional space on the third floor of the Kaufman-Strauss Building, just above the Premises and proceeded to negotiate an amendment of the Lease to accomplish this. In late August 2004, that amendment was reduced to final form and signed by Plaintiff. Defendant also signed the amendment but chose not to deliver the amendment to Plaintiff because it was at that time concerned about Plaintiff's ability to complete its project and perform under the Lease.[12]

In response to Plaintiff's failure to perform under the Lease, Defendant sent Plaintiff several notices under Section 2705 of the Lease. Defendant delivered a notice of default to Plaintiff on August 2, 2004, for failure to pay rent and failure to operate its business. Defendant delivered another notice of default to Plaintiff on August 31, 2004, for failure to pay rent and failure to operate its business. On September 8, 2004, Defendant delivered a general notice of default to Plaintiff, which included for the first time an express statement reserving its enforcement rights under the Lease. On October 6, 2004, Defendant sent Plaintiff formal notice of its termination of the Lease.

Under Section 1403 of the Lease, Plaintiff agreed not to allow mechanic's or materialmen's liens to be filed against the Premises or Fourth Street Live and agreed to discharge them or repay Defendant if Defendant chose to pay to discharge them. Plaintiff failed to pay several of its contractors, resulting in the filing of $927,049.88 in mechanic's liens against Fourth Street Live, a significant portion of which Defendant has paid to discharge on Plaintiff's behalf.

Plaintiff filed its Chapter 11 bankruptcy petition on October 4, 2004 and converted its case to Chapter 7 on November 8, 2004.[13] Plaintiff did not assume the Lease under 11 U.S.C. § 365.

---

[12]Plaintiff claims that it sought the additional space, and that Defendant was willing to provide such space, to make up for space "taken away" from the original Premises by Defendant when Defendant used part of the Premises for a service corridor. In addition to credible testimony by Defendant's representatives, the language of the undelivered amendment to the Lease, however, clearly demonstrates that such was not the case. Among other things, the amendment increases rent commensurate with the addition of the new space, without any reduction of the original rent for the space allegedly "taken away" from the original Premises. In the amendment, Plaintiff also confirms the efficacy of the Notice of Possession, which it presumably would not have done had it believed that the original space was not that for which it had bargained.

[13]Although Defendant sent its notice of termination of the Lease on October 6, 2004, two days after Plaintiff filed its bankruptcy petition, it is not clear that Defendant had notice of Plaintiff's bankruptcy at that time. In any event, Defendant's notice of termination was

CONCLUSIONS OF LAW

Each party asserts that the other party breached the Lease. Before the Court can conclude which party, if any, breached the Lease, it must clarify what are the terms of the Lease. Defendant asserts that the terms of the Lease are embodied entirely in the document that Plaintiff signed on November 19, 2003, and Defendant signed on November 24, 2003, plus the exhibits that Defendant attached at signing. Plaintiff's position with respect to the terms of the Lease is less clear. Plaintiff seems to assert that the terms of the Lease are embodied in the document that Plaintiff signed on November 19, 2003, plus exhibits attached by Defendant other than Exhibit A, as modified by certain oral communications between Defendant and Plaintiff. With regard to Exhibit A, Plaintiff appears to take the position that Exhibit A should have been what was attached by Defendant, without the service corridor.

The Court concludes that the terms of the Lease are embodied entirely within the documents signed by Plaintiff on November 19, 2003, and Defendant on November 24, 2003, plus the exhibits attached by Defendant at signing. As discussed above, both parties were represented by experienced, capable legal counsel, who spent a great deal of time negotiating and drafting the terms of the Lease. With the exception, perhaps, of Exhibit A, by the time Plaintiff signed the Lease on November 19, 2003, Plaintiff had had the opportunity to review final versions of the body of the Lease and the exhibits to be attached to the Lease. It signed the Lease apparently without expressing any concern about the fact that the exhibits had not been attached to the document that it signed. With regard to Exhibit A, as discussed above, the Court finds and concludes that Plaintiff either knew what the final version of Exhibit A would show before it signed the Lease or, if not, ratified the Exhibit A attached by Defendant after Plaintiff signed the Lease by failing to object to the same.

With regard to the oral modifications to the Lease alleged by Plaintiff, with the exception of Exhibit A discussed above, the Court concludes that the Lease is a fully integrated document and, therefore, will not look beyond the four corners of the Lease to interpret its terms.[14] Plaintiff argues

---

ineffective and the Lease did not terminate until, December 4, 2004, the date upon which the Lease was deemed rejected under 11 U.S.C. § 365(d)(4) as it read in 2004.

[14]In response to a motion *in limine* filed by Defendant, the Court previously found that the Lease was only partially integrated with respect to Exhibit A and heard parole evidence

that Defendant orally promised or agreed to certain modifications of the language of the Lease and breached its obligations under the modified Lease.  In particular, Plaintiff asserts that Defendant orally agreed to provide more improvements to the Premises than are reflected in writing in the description of required landlord work set forth in Exhibit C.

The Lease, however, contains an integration clause, which states in pertinent part as follows:

> There are no oral agreements between the parties hereto affecting this Lease and/or the Premises, and this Lease supersedes and cancels any and all previous written or oral negotiations, arrangements, letter of intent, lease proposals, brochures, agreements, representations, promises, warranties and understandings between the parties hereto or displayed by Landlord to Tenant with respect to the subject matter thereof, and none thereof shall be used to interpret or construe this Lease . . . . Tenant hereby expressly acknowledges that the Landlord Parties have made no representations, warranties, inducements or promises with respect to the Shopping Center or the Premises or this Lease . . . except as herein expressly set forth.  Tenant acknowledges that prior to entering into this Lease, Tenant has satisfied itself of all its concerns, if any, by conducting an independent investigation into all prior information provided by (or statements made by) Landlord or its agents . . . .

Also, according to Section 2603 of the Lease, "[n]o waiver by Landlord of any breach of any covenant, condition or agreement contained in this Lease . . . shall operate as a waiver of such covenant, condition, agreement or rule or regulation itself, or of any subsequent breach thereof."  Section 2603 of the Lease also provides that "[n]o provision of this Lease shall be deemed to have been waived by Landlord unless such waiver is in writing and signed by Landlord."  Furthermore, Section 3412 of the Lease states that "[t]his Lease may not be modified or amended except by a written instrument signed on behalf of Landlord and Tenant."

Plaintiff's principals are sophisticated businessmen, and Plaintiff was represented by capable counsel.  Accordingly, Plaintiff must be charged with knowledge and acceptance of these provisions of the Lease at the time that it signed the Lease.  Furthermore, Plaintiff has not claimed fraud or mistake with respect to its execution of the Lease.

Under Kentucky law, if the written contract is unambiguous, it must be interpreted strictly according to its terms and discerned from the four corners of the document itself without the use of

---

regarding the parties intentions there.  At that time, Plaintiff also proffered parole evidence with regard alleged oral modifications of other parts of the Lease, in particular the scope of landlord work set forth in Exhibit C, but the Court found no ambiguity in the Lease with regard to those terms and declined to hear such parole evidence.

11

extrinsic evidence. *Frear v. P.T.A. Indus., Inc.*, 103 S.W.3d 99, 105–06 (Ky. 2003); *Cantrell Supply, Inc. v. Liberty Mut. Ins. Co.*, 94 S.W.3d 381, 385 (Ky. Ct. App. 2002). Only if the contract is ambiguous or silent regarding a vital matter may extrinsic or parol evidence be considered to determine what the parties really intended. *See Cantrell*, 94 S.W.3d at 385.  Moreover, it is well established that an integration clause in a contract is "a sufficient basis to consider the agreement the complete and accurate integration of the contract." *KFC Corp. v. Darsam Corp.*, 543 F. Supp. 222, 225 (W.D. Ky. 1982); *see also Papa John's Int'l, Inc. v. Dynamic Pizza, Inc.*, 317 F. Supp. 2d 740, 745 (W.D. Ky. 2004). Such a clause "makes clear the intention of both parties that the agreement was to be the complete and exclusive statement of terms" and is "sufficient to prevent the consideration of prior representations." *KFC Corp.*, 543 F. Supp. at 225 (citations omitted).  In *O.P. Link Handle Co. v. Wright*, 429 S.W.2d 842, 847 (Ky. 1968), Kentucky's then highest court stated the rule as follows: "[W]hen two intelligent parties have read the contract before signing it, and one thereafter says it meant something different, or was subject to some unexpressed condition, reservation, limitation, proviso, or understanding, but the other says it meant just what it said, no more and no less, it is our opinion that stability and a salutary confidence in the written word requires the instrument itself to prevail."

As discussed above, Plaintiff and Defendant were intelligent parties, each assisted by counsel, who freely signed a comprehensive, written document. Plaintiff cannot now argue that the Lease meant something else or that the parties meant to agree to different terms and conditions.  The fact that Plaintiff might have intended different results is insufficient to construe a contract at variance with its plain and unambiguous terms. *Cantrell*, 94 S.W.3d at 385.

Having concluded what are the terms of the Lease, the Court must now consider whether either Plaintiff or Defendant breached any of such terms.

Plaintiff asserts that Defendant breached the Lease by failing to comply with Paragraph 10 of Exhibit C.  Paragraph 10 states as follows:

> Landlord will supply chilled water to the Premises via a central plant or, at Landlord's option, Landlord shall provide HVAC rooftop units with adequate tonnage capacity for Tenant's use as is determined by certified mechanical engineers.  Tenant will be responsible for all distribution and for modifying the air distrubtuin equipment in the space as required to meet its needs.

Plaintiff alleges that Defendant failed to provide an adequate system for cooling the Premises prior

to sending the Notice of Possession. As discussed above, the Court finds that Defendant did in fact "supply chilled water to the Premises via a central plant" prior to sending the Notice of Possession. Moreover, Plaintiff's complaint really goes to Defendant's alleged failure to provide adequate "air handling units," which is a requirement of Section 1706 of the Lease, not Exhibit C. Also as previously discussed, Plaintiff never sent Defendant a formal notice of non-compliance under Section 2705 of the Lease, either with respect to Exhibit C or Section 1706 of the Lease.

Plaintiff also asserts that Defendant breached its obligations under the lease by failing to provide Plaintiff with the $400,000.00 reimbursement for tenant construction costs and the $200,000.00 loan contemplated under Section 1405 of the Lease. With regard to the $400,000.00 reimbursement, the Court notes that the same is expressly contingent upon Plaintiff having completed construction and opened for business. Since Plaintiff never completed construction or opened for business, Defendant had no obligation to pay that amount to Plaintiff. With respect to the $200,000.00 loan, the Court notes that it is contingent upon Plaintiff not being in default of the Lease. Nothing in the record indicates that Plaintiff ever formally requested the loan under Section 2705 of the Lease at a time when Plaintiff was not in default of the Lease. Accordingly, the Court concludes that Defendant did not breach Section 1405 of the Lease.

Finally, Plaintiff asserts that Defendant breached a general duty to perform its obligations under the Lease and behave toward the Plaintiff in good faith. The Court finds no credible evidence that Defendant acted in bad faith toward Plaintiff and, therefore, concludes that Plaintiff's claim here must fail.

On the other hand, Defendant asserts that Plaintiff breached the Lease by failing to deliver acceptable plans and specifications for the Premises by February 24, 2004; failing to complete build out of the Premises by July 28, 2004, the end of the "Fixturing Period;" failing to pay rent to Defendant on and after the Rent Commencement Date of July 29, 2004; failing to operate the Premises as a fitness center on and after the Rent Commencement Date; and allowing mechanics' and materialmen's liens to be placed upon the Premises and/or Fourth Street Live. As discussed above, all of Defendant's assertions are correct, and, in fact, Plaintiff does not assert otherwise. Rather, Plaintiff seeks to excuse its non-performance on the basis of Defendant's alleged breach of the

13

Lease.[15] The Court has concluded that Defendant did not breach the Lease and, therefore, must conclude that Plaintiff has breached the Lease as asserted by Defendant.

Plaintiff having breached the Lease and Defendant being entitled to damages, the Court must now consider the amount of such damages. As discussed above, the Lease was deemed rejected on December 4, 2004, by operation of 11 U.S.C. § 365(d)(4). Under 11 U.S.C. § 502(b)(6)[16] claims for unpaid rent of a debtor are disallowed to the extent that they exceed the amount calculated in accordance with the following formula:

> (6) if such claim is the claim of a lessor for damages resulting from the termination of a lease of real property, [to the extent that] such claim exceeds–
> > (A) the rent reserved by such lease, without acceleration, for the greater of one year, or 15 percent, not to exceed three years, of the remaining term of such lease, following the earlier of–
> > > (i) the date of the filing of the petition; and
> > > (ii) the date on which such lessor repossessed, or the lessee surrendered, the leased property; plus
> > (B) any upaid rent due under such lease, without acceleration, on the earlier of such dates;

Because the Lease was terminated post-petition, the rent cap under 11 U.S.C. § 502(b)(6)(A) is calculated by reference to the petition date. As of the petition date, only approximately two months of the Lease's ten year term had elapsed.[17] According to the formula, and the rent rates set forth in

---

[15] As discussed above, although perhaps not a breach of the Lease, Plaintiff also seeks to excuse its failure to perform by alleging that Defendant delayed Plaintiff's own design and build out by changing HVAC systems after sending the Notice of Possession. Again, Plaintiff cannot complain about Defendant activity clearly contemplated by the Lease, particularly where Plaintiff did not put Defendant on formal notice that such activity was delaying its own work or otherwise seek to obtain a written modification of the Lease extending Plaintiff's time to perform.

[16] The Court acknowledges that this section of the Bankruptcy Code is intended to apply where there has been an objection to a proof of claim. Given that any award of damages here for unpaid rent will almost certainly soon be reflected in an amendment to Defendant's proof of claim in Plaintiff's associated Chapter 7 bankruptcy case, and given that Plaintiff would almost certainly object to the same if not calculated in accordance with 11 U.S.C. § 502(b)(6), the Court finds it prudent, if not necessary, to calculate Defendant's damages under this Code section.

[17] Under Sections 201(b) and 312 of the Lease, for purposes of calculating rent, the Lease's ten year term commenced on the Rent Commencement Date, i.e. July 29, 2004.

Section 201(d) of the Lease, pre-petition rent of $27,960.00 is allowed, plus 18 months,[18] or $313,730.00, of post-petition rent, for a total of $342,690.00.

Under Section 1403 of the Lease, Defendant is entitled to reimbursement of monies spent to discharge mechanics' and materialmen's liens allowed by Plaintiff to be filed against the Premises or Fourth Street Live in breach of Section 1403. There have been $927,049.88 in mechanics' liens filed against Fourth Street Live in breach of Section 1403, a large portion of which Defendant has paid to discharge. Accordingly, the Court will award $927,049.88 in damages to Defendant to allow it to recoup monies spent and monies which it will be required to spend to discharge those liens.

Finally, under Section 2701 of the Lease, Defendant is entitled to recoup its reasonable costs and expenses incurred in enforcing its rights against Plaintiff under the Lease. The total amount of such costs and fees, of course, cannot be known to Defendant until the conclusion of this Adversary Proceeding. Accordingly, the Court will permit Defendant to supplement the record in this Adversary Proceeding with a final statement of its costs and expenses for enforcing its right under the Lease and will award the same to Defendant at that time. Also, Defendant may file an amended proof of claim in Plaintiff's underlying Chapter 7 case to reflect all damages awarded by this Court within 30 days of entry of this Memorandum-Opinion and associated Order.

## CONCLUSION

For the foregoing reasons, the Court finds and concludes that Defendant did not breach the Lease and that Plaintiff did breach the Lease. A separate Order consistent with the foregoing has been entered in accordance with Federal Rule of Bankruptcy Procedure 9021.

*Thomas H. Fulton*
United States Bankruptcy Judge

Dated: March 1, 2011

---

[18] 15% of 9 years, 10 months is 1.47 years, i.e. 18 months when rounded to the nearest month.